# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DANIEL DWINNELLS, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FCA US LLC,<br><br>Defendant. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

Page

NATURE OF CLAIMS ........................................................................... 1

JURISDICTION AND VENUE ............................................................ 7

THE PARTIES ....................................................................................... 8

GENERAL FACTUAL ALLEGATIONS ......................................... 29

TOLLING OF THE STATUTE OF LIMITATIONS ....................... 53

I.       Fraudulent Concealment ............................................... 53

II.      Estoppel .......................................................................... 54

III.     Discovery Rule .............................................................. 55

CLASS ACTION ALLEGATIONS ................................................... 55

I.       Numerosity ..................................................................... 56

II.      Predominance of Common Issues ............................... 57

III.     Typicality ....................................................................... 60

IV.      Adequate Representation .............................................. 60

V.       Superiority ...................................................................... 60

REALLEGATION AND INCORPORATION BY REFERENCE ...... 63

CLAIMS FOR RELIEF ....................................................................... 63

        Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §
        2301 et seq. ...................................................................... 63

        Fraud ................................................................................. 68

        Negligence ........................................................................ 73

        Violation of the Michigan Consumer Protection Act, Mich.
        Comp. Laws §§ 445.903 *et seq.* .................................... 76

        Breach of the Michigan Implied Warranty of Merchantability,
        Mich. Comp. Laws § 440.2314 ...................................... 83

PRAYER FOR RELIEF ...................................................................... 84

DEMAND FOR JURY TRIAL .......................................................... 86

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1.      The things meant to protect us should not be made in a way that harms or even kills us.  This is particularly true of cars because they are a tool millions of people use every day.  People trust that their cars were designed and built to keep them safe.  And they expect that automakers (also known as "original equipment manufacturers" or "OEMs") take every reasonable step to make sure that nothing in their cars endangers the lives of those who ride in them.

2.      This action concerns defective airbags manufactured by Takata Corporation and its related entities ("Takata"), which contain inflators using the notoriously volatile and unstable compound, ammonium nitrate, but which were nevertheless equipped in vehicles that Defendant and related entities manufactured, sold or leased, or knowingly misrepresented as safe, when in fact they could explode and maim or kill drivers and passengers..

3.      An airbag is a critical safety feature of any motor vehicle.  Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.  An airbag's inflator, as its name suggests, is supposed to rapidly inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator ignites a propellant to produce gas that

is released into the airbag cushion, causing the airbag cushion to expand and deploy. The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

4.     All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in Defendant's defectively designed inflators (the "Inflator Defect"). Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior ranging from inertness to violent combustion. Ammonium nitrate is well-known for its explosive power. Indeed, it is the explosive that Timothy McVeigh and Terry Nichols used in April 1995 to bomb the Alfred P. Murrah Federal Building in downtown Oklahoma City. In 2006, a Takata factory suffered a severe explosion because of ammonium nitrate, a fact known to its OEM clients, including Defendant. In August 2016, a truck carrying Takata airbag parts crashed on a Texas road, detonating the ammonium nitrate in the truck in an immense blast, destroying a home, killing its elderly owner, and injuring four of her visitors.

5.     Because of the common, uniform Inflator Defect (*i.e.*, the inherent instability of ammonium nitrate), Takata airbags often fail to perform as they should. Instead of protecting vehicle occupants from bodily injury during

accidents, the defective Takata airbags too often violently explode, sometimes expelling metal debris and shrapnel at drivers and passengers.  As of July 2017, Takata airbags have been responsible for at least 12 deaths and 180 serious injuries in the United States alone.

6.      In the late 1990s, when Takata shelved a safer propellant in favor of the far cheaper ammonium nitrate, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan.  Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

7.      On information and belief, Defendant was intimately involved in the design and testing of the airbags that contained the Inflator Defect. When the Defendant approved Takata's airbags, and purchased them for installation in their vehicles, they were or should have been aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

8.      Defendant also knew or should have known that the Takata airbags were experiencing the same problems in other OEMs' vehicles. Takata and its OEM customers first received word of startling airbag failures in the field no later than 2003, when a Takata inflator ruptured in a BMW vehicle. Other ruptures and injuries took place in Honda vehicles in 2004 and 2007. After years of downplaying the danger, Honda issued a public recall in the United States in 2008,

putting all OEMs, including Defendant, on even greater notice of the danger. The alarm bells should have only grown louder in the coming years, as Honda and Takata issued further United States recalls of airbags with the Inflator Defect in 2009, 2010, 2011, and 2013, leading up to the record-breaking recalls that followed from 2014 onward. Yet, despite the repeated Takata/Honda recalls, Defendant utterly failed to take reasonable, let alone sufficient, measures to investigate or protect their purchasers and lessees, or the public.

9.    By May 2015, Takata had filed Defect Information Reports admitting the defect, and it would continue to add inflator models through additional DIRs in the coming years. Despite the overwhelming evidence of the defect, Defendant was not issuing recalls, warning consumers, or otherwise protecting them from the risk, for example through systematic loaner vehicle programs. The Defendant's delay is consequential—it exposes purchasers, lessees, drivers, passengers and, indeed, the general public, to ongoing and unnecessary risk of harm.

10.    Plaintiffs and consumers are in the frightening position of having to drive dangerous vehicles for many months or years while they wait for Defendant to replace the defective airbags in their cars. They are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

11.     Even more troubling, many of the replacement airbags that Takata and the OEMs are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed—they use unstable and dangerous ammonium nitrate as the propellant, a fact that Takata's representative admitted at a Congressional hearing in June 2015. Takata's representative also repeatedly refused to provide assurances that Takata's replacement air bags are safe and defect-free.

12.     Defendant knew, and certainly should have known, that the Takata airbags installed in millions of vehicles were defective.  By concealing their knowledge of the nature and extent of the defect from the public, while continuing to advertise their products as safe and reliable, Defendant has shown a blatant disregard for public welfare and safety.  Moreover, Defendant has violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

13.     As a result of this misconduct, Plaintiffs and members of the proposed Class were harmed and suffered actual damages.  Plaintiffs and the Class did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding

safe and reliable operation.  Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed.  Plaintiffs and the Class were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendant unjustly benefited from their unconscionable delay in recalling its defective products, as it avoided incurring the costs associated with recalls and installing replacement parts for many years.

14.     Plaintiffs and the Class also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.  Also, as a direct result of misconduct by Defendant, Plaintiffs and each Class member has or will have out-of-pocket economic damage by virtue of the time and expense of taking the time to bring their car in for repair.

15.     Plaintiffs and the Class also suffered damages as a result of Defendant's concealment and suppression of the facts concerning the safety, quality, and reliability of Defendant's vehicles with the defective Takata airbags. Defendant's false representations and omissions concerning the safety and reliability of those vehicles, and their concealment of the known safety defects

plaguing those vehicles and its brand, caused Plaintiffs and certain Class members to purchase or retain Defendant's vehicles of diminished value.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendant's home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.  This Court has personal jurisdiction over Defendant because at least one is a resident of Michigan, and pursuant to Mich. Comp. Laws § 600.705, because Defendant transact substantial business in this District; some of the tortious acts or omissions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendant operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendant's acts and omissions outside this state; and at or about the time of such injuries Defendant was engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendant

anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendant has harm to Class members residing in this District, and Defendant is a resident of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District.

## THE PARTIES

19.     FCA US LLC ("New Chrysler"), formerly known as Chrysler Group LLC, is a Delaware limited liability company with its principal place of business located at 1000 Chrysler Drive, Auburn Hills Michigan, and is citizen of the States of Delaware and Michigan. The sole owner of Chrysler is Fiat Chrysler Automobiles N.V., a public limited liability company incorporated under the laws of the Netherlands with its principal place of business located in London, United Kingdom.

20.     New Chrysler was created on or about June 1, 2009, in connection with the sale of substantially all of the assets of Chrysler LLC ("Old Chrysler") pursuant to a Sale Motion and Purchase Agreement ("Sale Agreement") approved by the United States Bankruptcy Court for the Southern District of New York under Section 363 of the U.S. Bankruptcy Code (the "363 Sale").  As a result of

the 363 Sale, New Chrysler acquired substantially all of Old Chrysler's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  New Chrysler also took responsibility for any necessary recalls of both New and Old Chrysler vehicles going forward.  The causes of action in this Complaint are directed solely to New Chrysler and are based solely on New Chrysler's wrongful conduct.

21.    Defendant engineered, designed, developed, manufactured, and installed the Defective Airbags in the Class Vehicles (defined below), and approved the Defective Airbags for use in those vehicles. It also developed, reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles.

22.    Plaintiff Rmzy Abdallah resides in Orchard Park, New York.  Plaintiff owns a 2015 Jeep Wrangler Sahara Edition, which he purchased new on June 14, 2015 for approximately $39,500 from Towne Chrysler Jeep, a New Chrysler dealership in Hamburg, New York.  Plaintiff's vehicle was covered by a written warranty.  Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New Chrysler vehicles generally.   To Plaintiff's knowledge, the airbags in his vehicle have not been repaired or replaced.  Plaintiff purchased his 2015 Jeep Wrangler Sahara Edition for recreational off-road use but has stopped driving his vehicle off

road out of concern for his safety due to the Inflator Defect. The value of Plaintiff's 2015 Jeep Wrangler Sahara Edition has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, Plaintiff would not have purchased the 2015 Jeep Wrangler Sahara Edition or would not have paid as much as he did for it.

23.    Plaintiff Bridget Boyd resides in Longview, Texas. Plaintiff Boyd owns a 2009 Chrysler Aspen, which she purchased used on April 11, 2015 for $20,200 from Driver's Choice in White Oak, Texas. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2009 Chrysler Aspen vehicles contain Takata airbags with the Inflator Defect and are subject to recall. After learning of this recall, Plaintiff attempted to get the airbags in her vehicle replaced but no replacement parts were available. To Plaintiff Boyd's knowledge, the airbags in her 2009 Chrysler Aspen have never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

24.    Plaintiff Carla Campagnone resides in Everett, Massachusetts. Plaintiff Campagnone owns a 2016 Jeep Wrangler, which was purchased new on June 26, 2016 for $44,610 from Kelly Jeep in Lynnfield, Massachusetts. Plaintiff's vehicle is covered under the original written warranty as well as under Mopar's

extended warranty. Plaintiff Campagnone reviewed materials regarding airbags and promotional materials for the 2016 Jeep Wrangler prior to purchasing it, at least some of which mentioned the vehicle was equipped with side airbags. On information and belief, New Chrysler has informed NHTSA and has publicly stated, that its 2016 Jeep Wrangler vehicles contain Takata airbags with the Inflator Defect and are subject to recall. When Plaintiff first learned of the recall, she looked it up and discovered that her vehicle was not scheduled to received replacement parts for several years. To Plaintiff Campagnone's knowledge, the airbags in her 2016 Jeep Wrangler have never been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

25.    Plaintiff T'Keyah Cooper resides in Spartanburg, South Carolina. Plaintiff Cooper owns a 2015 Dodge Charger, which she purchased used on September 5, 2017 for $24,772.50 from Spartanburg Chrysler Dodge Jeep Ram in Spartanburg, South Carolina. Plaintiff's 2015 Dodge Charger is covered by a written warranty. Plaintiff Cooper purchased an extended warranty. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2015 Dodge Charger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. Plaintiff Cooper has called her Dodge

dealership multiple times in an attempt to get the vehicle repaired, but she has not been able to reach them. To Plaintiff Cooper's knowledge, the airbags in her 2015 Dodge Charger have never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

26.    Plaintiff Daniel Dwinnells resides in Smithsburg, Maryland. Plaintiff Dwinnells owns a 2006 Dodge Dakota, which he purchased used on August 12, 2013 for $8,995.62 from Ideal Buick GMC in Frederick, Maryland. Prior to purchasing the vehicle, Plaintiff Dwinnells saw television commercials touting Chrysler's safety and reliability. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2011 Dodge Dakota vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Dwinnells' knowledge, the airbags in his 2006 Dodge Dakota have never been repaired or replaced, despite Plaintiff Dwinnells making numerous attempts to participate in the recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

27.     Plaintiff Michael Eikenberry resides in Tampa, Florida. Plaintiff Eikenberry owns a 2012 Chrysler 300, which he purchased used on June 5, 2015 from Auto World in Kokomo, Indiana. The vehicle was previously covered under a written warranty. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2015 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Eikenberry's knowledge, the airbags in his 2012 Chrysler 300 have been repaired or replaced under the recall.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

28.     Plaintiff Kenneth Fischer resides in Greenville, Indiana. Plaintiff Fischer owns a 2007 Dodge 3500 Ram, which he purchased used on October 16, 2014 for $21,698.86 from Troy Auto Group in Troy, Ohio. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2007 Dodge 3500 Ram vehicles contain Takata airbags with the Inflator Defect and are subject to recall. Plaintiff Fischer learned of these recalls and was told that the repair or replacement parts were not yet available and that he had to wait approximately nine months to obtain a replacement. To Plaintiff Fischer's knowledge, the airbags in his 2007 Dodge 3500 Ram have been replaced as part of the recall.  The value of Plaintiff's vehicle has been diminished as a result of the

Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

29.     Plaintiff John Fuesting resides in Collinsville, Illinois.  Plaintiff John Fuesting owns a 2015 Jeep Wrangler, which he purchased new on February 25, 2015 for $40,832 from Cassens & Sons Chrysler Dodge Jeep Ram, a New Chrysler dealership in Edwardsville, Illinois.  Prior to purchasing his vehicle, Plaintiff John Fuesting viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New Chrysler vehicles generally.   To Plaintiff John Fuesting's knowledge, the airbags in his vehicle have not been repaired or replaced.  The value of Plaintiff's 2015 Jeep Wrangler has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

30.     Plaintiff Priscilla Fuesting resides in Collinsville, Illinois.  Plaintiff Priscilla Fuesting owns a 2015 Jeep Wrangler, which she purchased new on February 27, 2015 for $36,000 from Cassens & Sons Chrysler Dodge Jeep Ram, a New Chrysler dealership in Edwardsville, Illinois.  Prior to purchasing her vehicle, Plaintiff Priscilla Fuesting viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and Jeep vehicles generally.  To Plaintiff Priscilla Fuesting's knowledge, the

airbags in her vehicle have not been repaired or replaced.  The value of Plaintiff's 2015 Jeep Wrangler has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

31.    Plaintiff Michelle Gibson resides in Lithonia, Georgia.  Plaintiff Gibson owns a 2010 Dodge Charger which she purchased used on August 14, 2013 for $36,000 from US Auto Sales, a New Chrysler dealership in Snellville, Georgia. Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New Chrysler vehicles generally.  To Plaintiff's knowledge, the airbags in her 2010 Dodge Charger have not been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect.  If Plaintiff Gibson had known about the Inflator Defect, she would not have purchased the vehicle or would not have paid as much as she did for it.

32.    Plaintiff Rushelle Gonder resides in Long Beach, California. Plaintiff Gonder owns a 2010 Chrysler 300 Touring, which she purchased used on July 20, 2012 for $21,000 from Scott Robinson Chrysler in Torrance, California. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2010 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Gonder's knowledge, the airbags in her

2010 Chrysler 300 Touring have never been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

33.     Plaintiff Marcia Griffith resides in Phoenixville, Pennsylvania. Plaintiff Griffith owned a 2010 Chrysler 300, which she purchased used on December 10, 2011 for $21,700.00 from John Kennedy Ford in Phoenixville, Pennsylvania. The vehicle was covered under a written warranty, and Plaintiff Griffith purchased an extended warranty for her 2010 Chrysler 300. Prior to purchasing the vehicle, Plaintiff Griffith viewed or heard commercials through television, radio, or the internet, touting the safety and reliability of the Chrysler 300 vehicle and New Chrysler vehicles in genral. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2010 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. Plaintiff Griffith learned of the recall through the internet. To Plaintiff Griffith's knowledge, the airbags in her 2010 Chrysler 300 have never been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

34.     Plaintiff Deborah Hillyer resides in Warren, Michigan. Plaintiff Hillyer owns a 2015 Chrysler 300, which she purchased used on July 29, 2016, for $29,987.76 from AM Automotive LLC in Roseville, Michigan. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2015 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Hillyer's knowledge, the airbags in her 2015 Chrysler 300 have never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

35.     Plaintiff Debrah Johnson resides in Covington, Georgia. Plaintiff Johnson owns a 2014 Dodge Charger, which she purchased new on July 29, 2014 for $29,867.98 from Landmark Chrysler Jeep Dodge, a New Chrysler dealership in Morrow, Georgia. Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New Chrysler vehicles generally. To Plaintiff's knowledge, the airbags in her 2014 Dodge Charger have never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff Johnson had known about the Inflator Defect, she would not have purchased the 2014 Dodge Charger or would not have paid as much as she did for it.

36.     Plaintiff Dave Krzeminski resides in Howell, Michigan. Plaintiff Krzeminski owns a 2007 Dodge Ram 1500, which he purchased used for roughly $14,000 from a used car dealership in Howell, Michigan in January 2013. On information and belief, Defendant New Chrysler has informed NHTSA and has publicly stated that 2007 Dodge Ram 1500 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. Plaintiff Krzeminski was not notified of this recall until late 2017. To Plaintiff Krzeminski's knowledge, the airbags on his 2007 Dodge Ram 1500 have never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

37.     Plaintiff Jamelle Lowery resides in Greer, South Carolina. Plaintiff Lowery owns a 2014 Chrysler 300, which she purchased used in August 2015 for $24,000 from Crown Nissan in Greenville, South Carolina. Plaintiff's 2014 Chrysler 300 was covered under a written warranty through 2017. Plaintiff Lowery saw commercials regarding safety for the Chrysler 300 prior to purchasing the vehicle. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2014 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. Plaintiff Lowery has been unable to get her vehicle repaired due to lack of available replacement parts. To Plaintiff

Lowery's knowledge, the airbags in their 2014 Chrysler 300 have never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

38.     Plaintiff Pedro Lucero resides in Fairfield, California. Plaintiff Lucero owns a 2012 Chrysler 300, which he purchased new in April of 2012 for $42,000 from Elk Grove Chrysler in Elk Grove, California. Plaintiff Lucero's 2012 Chrysler 300 is covered under a standard written warranty from Chrysler. Prior to purchasing his vehicle, Plaintiff Lucero viewed television commercials and new car brochures. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2012 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Lucero's knowledge, the airbags in his 2012 Chrysler 300 have never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

39.     Plaintiff Victoria Lykins resides in Sardinia, Ohio. Plaintiff Lykins owns a 2012 Dodge Challenger, which she purchased new in November 2013 for $32,000 from Jeff Wyler, Eastgate Automall in Batavia, Ohio. Plaintiff Lykin's

vehicle is currently under written warranty. Plaintiff viewed television and internet advertisements for the vehicle prior to purchase. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2012 Dodge Challenger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Lykins's knowledge, the airbags in her 2012 Dodge Challenger have never been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

40.    Plaintiff Ronaldo Maldia resides in Poway, California. Plaintiff Maldia owns a 2006 Dodge Charger, which was purchased used in December 2010 for $18,554 from Balboa Motors in San Diego, California.  To Plaintiff Maldia's knowledge, the airbags in his 2006 Dodge Charger have never been repaired or replaced. The value of his 2006 Dodge Charger has been diminished as a result of the Inflator Defect. If Plaintiff Maldia had known about the Inflator Defect, he would not have purchased the 2006 Dodge Charger or would not have paid as much as he did for it.

41.    Plaintiff Gene Marsilio resides in Fair Lawn, New Jersey.  Plaintiff Marsilio owns a 2012 Dodge Challenger which he purchased used on March 21, 2016 for $35,351.53 from Luxury Haus, a dealership in Leonia, New Jersey.

Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New Chrysler vehicles generally. To Plaintiff's knowledge, the airbags in his 2012 Dodge Challenger have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff Marsilio had known about the Inflator Defect, he would not have purchased the vehicle or would not have paid as much as he did for it.

42.     Plaintiff Michael McClellion resides in Pelzer, South Carolina. Plaintiff McClellion owns a 2010 Dodge Charger, which he purchased used on February 9, 2011 for $18,900 from Elite Car Rental in Greenville, South Carolina. Prior to purchasing the vehicle, Plaintiff McClellion viewed advertisements for the vehicle. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2010 Dodge Charger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. However, when Plaintiff McClellion contacted the dealership about the airbags, he was told that he could keep driving his vehicle and that his vehicle was fine. To Plaintiff McClellion's knowledge, the airbags in his 2010 Dodge Charger were replaced under the recall; one in August of 2015 and the other in November of 2017. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the

Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

43.     Plaintiff Shanna Moore resides in Trinity, Texas. Plaintiff Moore owns a 2010 Dodge Charger, which she purchased on January 5, 2010 for $23,300 from Team Dodge in Huntsville, Texas. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2010 Dodge Charger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. However, when Plaintiff Moore attempted to have the airbags in her vehicle replaced, she was told that the parts were not available. To Plaintiff Moore's knowledge, the airbags in her 2010 Dodge Charger have never been repaired or replaced.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

44.     Plaintiff Randy Nielsen resides in Cape Giradeau, Missouri. Plaintiff Nielsen owns a 2012 Chrysler 300, which he purchased used on January 2, 2014, for $22,500 from Alexander Dodge in Albertville, Alabama. Plaintiff Nielsen's 2012 Chrysler 300 is covered under the manufacturer's written warranty. Prior to purchasing the vehicle, Plaintiff Nielsen reviewed TV and radio advertisements as well as e-mails from Chrysler, which promoted the vehicle's safety. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2012 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are

subject to recall. When Plaintiff Nielsen initially called about the recall, the dealership was not able to schedule an appointment to get the vehicle repaired. Plaintiff Nielsen's airbags were replaced in December 2017.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

45.    Plaintiff Laquintha O'Neal resides in Kannapolis, North Carolina. Plaintiff O'Neal owns a 2012 Dodge Charger, which she purchased on March 8, 2015 for $20,427.50 from Carmax in Charlotte, North Carolina. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2012 Dodge Charger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff O'Neal's knowledge, the airbags in her 2012 Dodge Charger have been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

46.    Plaintiff Cathy Parker resides in Charleston, Arkansas. Plaintiff Parker owns a 2014 Chrysler 300, which she purchased new on December 23, 2014, for $33,869 from Breeden Dodge Chrysler Jeep Ram in Fort Smith, Arkansas. Plaintiff's vehicle is covered under the original manufacturer's warranty. On

information and belief, New Chrysler has informed NHSTA and has publicly stated that its 2014 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. Plaintiff Parker did not learn of the recall until October of 2017. To Plaintiff Parker's knowledge, the airbags in her 2014 Chrysler 300 have never been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

47.    Plaintiff Reginald Price resides in Cincinnati, Ohio. Plaintiff Price owns a 2005 Chrysler 300, which he purchased used on December 9, 2014 for $9,000 from Dixie Import in Fairfield, Ohio. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2005 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Price's knowledge, the airbags in his 2005 Chrysler 300 have been repaired or replaced. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

48.    Plaintiff Laurie Reynolds resides in Lake Havasu City, Arizona. Plaintiff Reynolds owns a 2013 Dodge Charger, which she purchased used on May 12, 2016 for $21,565.46 from Anderson Toyota in Lake Havasu City, Arizona. On information and belief, New Chrysler has informed NHTSA and has publicly

stated that its 2013 Dodge Charger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Reynolds' knowledge, the airbags in her 2013 Dodge Charger have been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

49.     Plaintiff Bobbie Simmons resides in Morrilton, Arkansas. Plaintiff Simmons owns a 2010 Jeep Wrangler, which he purchased used in December 2012 for $28,000 from Payton Dodge in Clinton, Arkansas. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2010 Jeep Wrangler vehicles contain Takata airbags with the Inflator Defect and are subject to recall.  To Plaintiff Simmons's knowledge, the airbags in his 2010 Jeep Wrangler have never been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

50.     Plaintiff Arlen Sturgis resides in Durant, Mississippi. Plaintiff Sturgis owns a 2007 Chrysler Aspen, which he purchased in 2013 for $13,500 from Southern Imports, Inc. in Ridgeland, Mississippi. On information and belief, New Chrysler has informed NHTSA and has publicly stated that 2007 Chrysler Aspen

vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Sturgis's knowledge, the airbags in his 2007 Chrysler Aspen have never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

51.     Plaintiff Terrie Swanson resides in Granite Falls, North Carolina. Plaintiff Swanson owns a 2011 Chrysler 300, which she purchased used on April 24, 2013 for $23,991.26 from Hickory Used Car Superstore in Hickory, North Carolina. Plaintiff's vehicle was covered under a written warranty, which has since expired. On information and belief, New Chrysler has informed NHTSA and has publicly stated that its 2011 Chrysler 300 vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Swanson's knowledge, the airbags in her 2011 Chrysler 300 have never been repaired or replaced. She is still waiting to get her airbags repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

52.     Plaintiff Elizabeth Washington resides in Milwaukee, Wisconsin. Plaintiff Washington owns a 2010 Dodge Challenger, which she purchased used on

October 9, 2013from Howard Automotive in Elmhurst, Illinois. On information and belief, Defendant New Chrysler has informed NHTSA and has publicly stated that 2010 Dodge Challenger vehicles contain Takata airbags with the Inflator Defect and are subject to recall. Plaintiff Washington learned of the recall when she received a postcard in the mail. When Plaintiff Washington contacted a dealership to set up an appointment to get her airbag fixed, she was told that the replacement parts were not available. After multiple attempts to get the recall countermeasure performed, on November 18, 2017, the airbag in Plaintiff Washington's 2010 Dodge Challenger was replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

53.    Plaintiff Jason Williams resides in Kansas City, Missouri. Plaintiff Williams owns a 2012 Jeep Wrangler, which he purchased in May 2012 for $33,000 from Dodge Chrysler Jeep and Ram in Gladstone, Missouri. On information and belief, Defendant New Chrysler has informed NHTSA and has publicly stated that its 2012 Jeep Wrangler vehicles contain Takata airbags with the Inflator Defect and are subject to recall. To Plaintiff Williams's knowledge, the airbags in his 2012 Jeep Wrangler have never been repaired or replaced.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If

Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

54.     Plaintiffs and the proposed Class were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed. Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags, and the widespread publicity of the Inflator Defect.

55.     Further, Plaintiffs and the proposed Class did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Plaintiffs and the Class, either through a higher purchase price or higher lease payments, paid more than they would have had the Inflator Defect been disclosed. Plaintiffs and the Class were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendant unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

56.     Plaintiffs and the proposed Class also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to

expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

57.    The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiffs and the proposed Class.

## **GENERAL FACTUAL ALLEGATIONS**

58.    Plaintiffs bring this action on behalf of themselves and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from Defendant's manufacture, sale or lease, and false representations concerning the defective airbags in the Class Vehicles, including but not limited to diminished value.  Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties, and injunctive relief/equitable relief.

59.    ""Class Vehicles" refers to all vehicles in the United States that have Defective Airbags (defined below) that were: (1) manufactured, sold, distributed, or leased by New Chrysler; or (2) manufactured, sold, distributed, or leased by Old Chrysler and purchased or leased by a Class member after June 1, 2009.

60.    "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata ("Takata airbags") that use ammonium nitrate as the

propellant in their inflators (the "Inflator Defect"), including (a) all airbags subject to the recalls identified below; (b) all Takata airbags in Defendant's vehicles subject to recalls relating to Takata's May 18, 2015 DIRs, the Coordinated Remedy Order issued by NHTSA in *In re Docket No. NHTSA-2015-0055 Coordinated Remedy Program Proceeding*, and amendments thereto, concerning Takata's ammonium-nitrate inflators, and the Consent Order issued by NHTSA in *In re EA 15-001 Air Bag Inflator Rupture*, and any amendments thereto; and all Takata airbags in Defendant's vehicles subject to any subsequent expansion of pre-existing recalls, new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to over-aggressively deploy and/or rupture.

61.   All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

62.   The following table identifies, to the best of Plaintiffs' understanding and without the benefit of discovery, the vehicles either recalled or scheduled to be recalled by Defendant, and which of the front airbags were included in the recall for each vehicle (driver, passenger, or both):

| Recall | Make | Model | Model Years | Side(s) |
|--------|------|-------|-------------|---------|
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-001, 18E-002, 18E-003 | Chrysler | 300 | 2005-2012 | Both |
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-003 | Chrysler | Aspen | 2007-2009 | Both |
| 16V-081 | Chrysler | Crossfire | 2007-2008 | Driver |
| 15V-313, 16V-352 | Chrysler | SRT8 | 2005-2010 | Both |
| 15V-313, 16V-352, 18E-002, 18E-003 | Dodge | Challenger | 2008-20122013 | Both |
| 15V-313, 16V-352, 18E-002, 18E-003 | Dodge | Charger | 2005-2012 | Both |
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-002, 18E-003 | Dodge | Dakota | 2005-2011 | Both |

| Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-003 | Dodge | Durango | 2004-2009 | Both |
| 14V-817, 15V-313, 16V-352 | Dodge | Magnum | 2005-2010 | Both |
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-003 | Dodge Ram | 1500/2500/3500 Pickup | 2003-2009 | Both |
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-003 | Dodge Ram | 3500 Cab Chassis | 2007-2010 | Both |
| 14V-354, 14V-770, 14V-817, 15V-313, 16V-352, 18E-002, 18E-003 | Dodge Ram | 4500/5500 Cab Chassis | 2008-2010 | Both |
| 16V-341 | Ferrari | California | 2009-2011 | Passenger (PSPI-2) |
| 16V-341 | Ferrari | 458 Italia | 2010-2011 | Passenger (PSPI-2) |
| 17V-018 | Ferrari | California | 2012 | Passenger (PSPI-2) |
| 17V-018 | Ferrari | 458 Italia | 2012 | Passenger (PSPI-2) |

| Recall | Make | Model | Model Years | Side(s) |
|--------|------|-------|-------------|---------|
| 17V-018 | Ferrari | 458 Spider | 2012 | Passenger (PSPI-2) |
| 17V-018 | Ferrari | FF | 2012 | Passenger (PSPI-2) |
| 16V-352 | Jeep | Wrangler | 2007-2012 | Passenger |

63.    As recently as January 2018, Defendant and Takata announced additional large recalls, identified as 18E-001, -002, and -003.

64.    The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag. This process occurs within milliseconds.

65.    The following basic illustration, included earlier in this Complaint as well, depicts Takata's airbag module:



66.    When it began manufacturing airbags in the 1980s, Takata used sodium azide as the propellant within its inflators. In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

67.    In the late-1990s, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives.

68.     In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team had only "a couple days" to do its review.

69.     In fact, ammonium nitrate is an inherently volatile and unstable chemical. Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature and moisture cause it to break down over time, which can lead to unpredictable and dangerous results, such as violent detonation or the chemical becoming effectively inert. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

70.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks and often expressed them publicly. It stated in a 1995 patent document that ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is

that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

71.     Takata further admitted in a 1999 patent document that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

72.     Similarly, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture."  The 2006 patent document purportedly contained a fix for that sort of rupturing. Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused a serious injury, and incidents continued to mount after that time as well.  Takata submitted a patent application with other purported "fixes" as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

73.    In a 2007 patent for allegedly phase stabilized ammonium nitrate that

incorporates a scavenging additive designed to retain moisture in an effort to

prevent these catastrophic ruptures, Takata representatives noted the following:

> Without the addition of the [additive], and as shown in
> [the patent], the ballistic curves indicate that changes
> occurred in the gas generant after 50 cycles. After 100
> cycles the ballistic performance was very aggressive and
> did not meet USCAR specification. After 200 cycles the
> ballistic performance was so aggressive the ballistic
> performance was so aggressive that the inflator ruptured
> due to extremely high internal pressures.

74.    Thus, Takata's inflators were "grenades" in the glove box or steering

wheel waiting to detonate after going through 100 or 200 cycles of thermal

cycling, which, of course, is something cars in the real world will eventually do.

75.    The use of this additive (or any other) designed to address ammonium

nitrate's hygroscopic nature (affinity for moisture) is, at best, a temporary fix

because at some point the additive will no longer be able to absorb the excess

moisture and the ballistic curves will again exceed specification leading to

ruptures.

76.    The only conceivable "advantage" to the compound for an airbag

manufacturer and its OEM clients, according to the expert quoted in *The New York

Times*, is that it is "cheap, unbelievably cheap." Takata had originally planned to

use tetrazole as its propellant, which is not only more stable than ammonium

nitrate, but also yields other desired benefits, such as being more environmentally

friendly. But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

77.    Not surprisingly, other major airbag manufacturers, including Autoliv and Key Safety Systems have reportedly avoided using ammonium nitrate as a propellant. Takata's representative confirmed at a Congressional hearing in June 2015 that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

78.    Takata and Defendant became further aware of the instability of its ammonium nitrate propellant from the persistent and glaring quality control problems Takata encountered in its manufacturing operations. The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico. Defendant routinely visited and audited Takata operations, including in response to quality and safety concerns.

79.    Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail. Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*. On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to

engineering presentations.  In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.

80.    Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant. Defendant was well aware of this explosion, as detailed in § III, *infra*.

81.    Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

82.    Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

83.    Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant. In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded = one life less, which shows we are not fulfilling the mission."  The title of the e-mail was "Defectos y defectos

y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

84.    Yet handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

85.    Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early- and mid-2000s as it won big new clients.

86.    On information and belief, at all relevant times, Defendant exercised close control over suppliers, including airbag and airbag inflator suppliers. On information and belief, Defendant prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were and are required to meet. On information and belief, given its general control over its suppliers,

Defendant knew or should have known, prior to approving the Defective Airbags that Takata used an ammonium nitrate propellant in its inflators.

87.    In 1992, Old Chrysler, along with Ford and General Motors, founded the United States Council for Automotive Research ("USCAR").  Thereafter, these three U.S. automakers began collaborating on the USCAR specifications for airbag inflators.  These specifications included requirements for testing related to the use of ammonium nitrate as a propellant in airbag inflators.  These USCAR specifications recognized that inflators using ammonium nitrate were particularly problematic and required additional testing: "**Propellant Stability**.  Ammonium Nitrate containing propellants shall be required to undergo added stability evaluation for propellant strength and burn rate stability as agreed to by the Responsible Vehicle Engineering Organization." This additional testing was based upon the well-known problems with ammonium nitrate losing stability when exposed to moisture and thermal cycling.

88.    In fact, the *New York Times* has reported that, in the late 1990s, Autoliv, another company that supplied airbags to Old Chrysler, had its scientists study the Takata airbag, and they learned that it utilized the dangerously volatile compound, ammonium nitrate.

89.    According to the *New York Times*, Robert Taylor, Autoliv's head chemist at the time, analyzed every facet of the Takata airbag, including the

propellant, ammonium nitrate.  The takeaway, he said, was that when the airbag was detonated, "the gas generated so fast, it blows the inflator to bits."  Chris Hock, a former member of Mr. Taylor's team, said a mock ammonium nitrate inflator test "totally destroyed the fixture" and "turned it into shrapnel." Upon information and belief, these findings were shared with Old Chrysler and subsequently passed on to New Chrysler.

90.     New Chrysler did not issue their first official recall until 2014, despite an abundance of public information regarding the dangers associated with Takata airbags using ammonium nitrate.

91.     In April 2009, Old Chrysler filed for bankruptcy.  On June 1, 2009, under Section 363 of the U.S. Bankruptcy Code, the United States Bankruptcy Court for the Southern District of New York approved the sale of substantially all of Old Chrysler's assets pursuant to the Sale Agreement, and  New Chrysler acquired substantially all of Old Chrysler's books, records, and personnel.  When New Chrysler acquired Old Chrysler's books, records, and personnel, it acquired the knowledge of the Inflator Defect that those books, records, and personnel held.

92.     On September 7, 2013, a PSDI-4 inflator in a Chrysler vehicle ruptured in the field, injuring the vehicle occupant.

93.     Further, any cursory attention paid to Takata's track record should have further fueled Defendant's concern over ammonium nitrate inflators. Takata

airbags made it to market in model year 2001. By 2003, there were two ruptures, including one that lead to a fatality in Arizona, and another that took place in a vehicle manufactured by BMW. The BMW incident took place in Switzerland and was jointly investigated by BMW and Takata.

94.     Additional, alarming incidents continued to mount regularly, including a rupture in 2004 in Alabama, and a trio of incidents in the summer of 2007. These four incidents took place in Honda vehicles, and notably, Honda filed a standard report with U.S. safety regulators for each of them.

95.     Had they acted as reasonable OEMs, Defendant would have kept abreast of information submitted by a major OEM about a key supplier to a key regulator. Moreover, by November 2008—well after Defendant had accumulated significant knowledge regarding the troubling risks of Takata airbags—Honda issued its first public recall in the United States. The recall notice expressly noted the risk that Takata airbags "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall").  Coupled with their ongoing concerns over this precise risk, Defendant had every obligation to act swiftly to protect their past and prospective consumers, and yet they did not.

96.     Tragically, this failure would then be repeated serially over the next five years. Following the 2008 Honda recall, yet additional ruptures took place,

many causing accidents, injuries, and/or fatalities. By 2009, Honda had issued its
second recall in the United States, putting all OEMs, including Defendant, on still
further notice of the airbag defect. This pattern of incidents and recalls continued
unabated—with increasingly large recalls of Takata airbags issued in 2010, 2011,
and 2013—and yet prompted no response from Defendant.

97.    On April 11, 2013, Takata filed a DIR titled "Certain Airbag Inflators
Used as Original Equipment." While it sought to cabin the scope of the problem, it
again openly admitted concerns over propellant moisture absorption and
deterioration, and "over-aggressive combustion" and inflator "rupture." Shortly
thereafter, six major automakers, including Nissan, Mazda, BMW, Pontiac, and
Honda, issued recalls of 3.6 million vehicles containing Takata airbags. Defendant,
by contrast, remained silent.

98.    By the end of June 2014, the number of vehicles recalled due to the
Inflator Defect had increased to over 6 million, which would ultimately only be a
small fraction of the total recall. And, with public knowledge of the defect
growing, the number of rupture-related injuries and fatalities continued to grow as
well. In the summer and fall of 2014 alone, seven incidents were widely reported,
including unsuspecting individuals who died, were rendered quadriplegic, and
suffered severe head injuries. That pace continued in the years to come.

99.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient. NHTSA therefore demanded a national recall of many OEMs, and began speaking out more forcefully against OEMs' endless delay and intransigence in the face of a deadly risk.

100.    In light of ongoing testing, on May 18, 2015, Takata filed four DIRs with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. Takata admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators."  In testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

101.    As a result of Takata's admission that its inflators are defective, the total number of recalled vehicles nationwide will exceed 40 million.

102.    Over the past 15 years that Defendant, OEMs, and their supplier have known there was a problem with the safety of their airbags, there have been at least 12 deaths and 180 injuries linked to the Defective Airbags nationwide. Globally, the numbers are even larger. As detailed above, the incidents date back to at least 2003, and involve vehicles made by numerous OEMs. Defendant knew or should

have known of the Inflator Defect by virtue of these incidents—among many other sources of knowledge—but failed to disclose the nature and scope of the Inflator Defect.

103.   The Defendant was on further notice due to additional, unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Class Vehicles, events that may be tied to the unstable and volatile ammonium nitrate propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both).

104.   At all relevant times, in advertisements and promotional materials, Defendant continuously maintained that their vehicles were safe and reliable, while uniformly omitting any reference to the Inflator Defect. Plaintiffs, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements about Class Vehicles' safety in Defendant's advertisements and promotional materials were material to decisions to purchase or lease Class Vehicles.

105.   Examples of Defendant's safety and reliability representations include the following.

a.   In 2017, New Chrysler's website listed its mission as: "To create the type of exciting, efficient, reliable, safe vehicles you expect and deserve."

b.   In 2017, New Chrysler, describes the design of the 2007 - 2017 Jeep Wrangler on Jeep's website as: "With an all-new frame, exterior and interior design, engine, safety and security and convenience features, the Jeep Wrangler was built on the successful, original Jeep Brand formula."

c.   A February 9, 2012 press release boasting that the 2012 Chrysler 300 and 2012 Dodge Charger have achieved 5-star safety ratings from NHTSA, and that the Chrysler 300 and Dodge Charger were named a "Top Safety Pick" by the Insurance Institute for Highway Safety. The press release further quotes the Senior Vice President-Engineering of Chrysler, who stated: "we're very pleased that both the 2012 Chrysler 300 and 2012 Dodge Charger have achieved the highest overall rating" and that: "both vehicles are robustly designed with a rigid structure to protect occupants and have numerous advanced safety features…."

d.   The 2012 Dodge Charger brochure, highlighting that the Charger was a 2011 Insurance for Highway Safety ("IHS") top safety pick. The

brochure further states that: "[s]afety and security are the driving principles behind every Dodge vehicle, including Charger" and that: "[a]dvanced multistage front air bags, supplemental front-seat mounted pelvic-thorax side air bags, driver-side knee air bag, and supplemental side-curtain air bags for front and rear outboard occupants are all standard."

      e.    The 2011 Dodge Dakota brochure, which claims that the: "Dakota heritage of protecting you and your passengers is uncompromising. In addition to the many safety and security features listed here, all 2011 Dakota models now feature supplemental side-curtain air bags as standard equipment and, of course, four-wheel ABS."

      f.    The 2011 Jeep Wrangler brochure, asserting that: "Wrangler's got your back, your sides, as well as your front end. Just as Wranglers are purpose-built for fun, they're also infused with advanced active and passive systems designed to help keep you safe and secure. At the forefront are the standard advanced multistage front air bags."

      g.    The 2011 Chrysler 300 brochure, which includes the slogan: "this kind of safety gives you that kind of security." The brochure further advertises that: "advanced multistage front air bags, supplemental front-seat thorax side air bags, driver-knee air bag, and supplemental side-curtain air bags for front and rear outboard occupants are all standard."

h.    The 2009 Chrysler 300 brochure stating that:

[n]o one wants to test a vehicle's impact resistance, but 300 is

ready, if it occurs…. Advanced multistage front air bags deploy

in staged amounts, depending on impact severity, while

available front seat-mounted side air bags with supplemental

front and rear side-curtain air bags offer additional side-impact

protection to front and rear outboard occupants.

106.    Contrary to these representations and countless others like them,

Defendant failed to equip the Class Vehicles with airbags that would meet these

standards, and they failed to disclose to consumers that their vehicles actually

contained dangerous and defective airbags.

107.    Though the first Takata Airbag related recall was launched years

earlier, Defendant failed to timely initiate a field action.

108.    Even those vehicles that have been recalled have little chance of being

repaired in the near term. Under the recalls required under NHTSA's Coordinated

Remedy Order, approximately 44 million vehicles will be recalled in the United

States due to the Inflator Defect.

109.    At a Congressional hearing in June 2015, Takata's representative

testified that Takata was shipping approximately 700,000 replacement inflators per

month, and expected to increase production to 1 million replacement inflators per

month by September 2015 – well short of the number required to supply the ten automakers that have issued recalls.

110.   At the current rate, it will take several years to produce enough Takata inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service departments would be able to provide the necessary services in a timely manner.

111.   Not surprisingly, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags.  Dealers have been telling frustrated car owners they can expect to wait many months before their airbags can be replaced.

112.   In response to the airbag replacement shortage, certain automakers have taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made.  In the alternative, some automakers are advising customers to refrain from driving their vehicles until the airbags can be replaced.

113.   Other automakers have also chosen to "repair" their customers' vehicles not by providing temporary replacement vehicles or replacement parts, but by disengaging the Takata airbags entirely.

114.   Congress has voiced concerns about this serious problem. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation (DOT), said they were:

> [A]larmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags.

115.   The Class Vehicles are not safe to drive. They have been recalled, and yet replacement of the Defective Airbags could take years. Due to Defendant's failures, Plaintiffs and Class members are left with poor options: be without use of a vehicle; purchase, lease, or rent a new vehicle until Defendant complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time.

116.   As Senators Blumenthal and Markey further asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

117.   Yet, Defendant are not providing loaner or replacement vehicles on a comprehensive basis.

118.   Perhaps most alarming, the replacement components manufactured by Takata that many OEMs, potentially including Defendant, are using to "repair" recalled Class Vehicles suffer from the same Inflator Defect that plagues the parts being removed: they use ammonium nitrate as the inflator's primary propellant. Indeed, Takata admitted in its submitted DIRs and at the June 2015 Congressional hearing that inflators installed in recalled vehicles as replacement parts are, in fact, defective and must be replaced yet again. And even recall notices issued in 2015 acknowledge that certain "replacement inflators are of the same design and materials as the inflators being replaced."

119.   Moreover, inspection of inflators manufactured by Takata as recently as 2014 and installed by manufacturers through the recall process reveals that the ammonium nitrate pellets within the inflators already show signs of moisture-induced instability, such as rust stains, the tendency to clump together, and size variations.  As a result, Takata cannot reasonably assure Plaintiffs or Class members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

120.   By way of example, Paragraph 30 of the November 2015 Consent Order provides that the NHTSA Administrator may issue final orders for the recall of Takata's desiccated phase stabilized ammonium nitrate ("PSAN") inflators, used as both original and replacement equipment, if no root cause has been

determined by Takata or any other credible source, or if Takata has not otherwise shown the safety and/or service life of the parts by December 31, 2019.  But as of July 10, 2017, Takata began recalling certain desiccated PSAN inflators installed in Ford, Mazda and Nissan vehicles.

121.   Moreover, while Takata and automakers had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, several automakers have been or will be required to recall some vehicles from model year 2013 and later because of the risk of the Takata airbags rupturing.  And Takata has now admitted that replacement airbags installed in some recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

## TOLLING OF THE STATUTE OF LIMITATIONS

### I.   Fraudulent Concealment

122.   On information and belief, Defendant have known of the Inflator Defect in the Defective Airbags since the date that New Chrysler acquired substantially all of Old Chrysler's  books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Prior to installing the Defective Airbags in their vehicles, Defendant knew or should have known of the Inflator Defect, and Defendant was or should have been

made aware through the design process, testing, public reports of ruptures and adverse events, and regular recalls starting no later than 2008. Defendant have concealed from or failed to notify Plaintiffs, Class members, and the public of the full and complete nature of the Inflator Defect.

123.   Although Defendant may have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendant did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

124.   Any applicable statute of limitations has therefore been tolled by Defendant's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**II.    Estoppel**

125.   Defendant was and is under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. They actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class members reasonably relied upon Defendant's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, Defendant are estopped from relying on any statute of limitations in defense of this action.

## III.   Discovery Rule

126.   The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their vehicles had the Defective Airbags.

127.   Plaintiffs and Class members, however, had no realistic ability to discern that the vehicles were defective until—at the earliest—after either the Defective Airbag exploded or their vehicles were recalled. And even then, Plaintiffs and Class members had no reason to discover their causes of action because of Defendant's active concealment of the true nature of the defect.

## CLASS ACTION ALLEGATIONS

128.   The Class' claims all derive directly from a single course of conduct by Defendant. This case is about the responsibility of Defendant, at law and in equity, for their knowledge, their conduct, and their products. Defendant have engaged in uniform and standardized conduct toward the Class. They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Class, the same legal standards govern. Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide Class for some or all claims. Accordingly, Plaintiffs bring this lawsuit

as a class action on their own behalf and on behalf of all other persons similarly

situated as members of the proposed Class pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the

numerosity, commonality, typicality, adequacy, predominance, and superiority

requirements of those provisions.

129.    Plaintiffs bring this action and seek to certify and maintain it as a class

action under Rules 23(a); (b)(2); and/or (b)(3); and/or c(4) of the Federal Rules of

Civil Procedure on behalf of themselves and a national Class defined as follows:

> All persons in the United States who, prior to the date on which the
> Class Vehicle was recalled and after June 1, 2009, (a) entered into a
> lease for a Class Vehicles, or (b) bought a Class Vehicle, and who (i)
> still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after
> the date on which the Class Vehicle was recalled, or (iii) following an
> accident, whose Class Vehicle was declared a total loss after the date
> on which the Class Vehicle was recalled.

## I.    Numerosity

130.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).

There are millions of Class Vehicles nationwide, and thousands of Class Vehicles

in each of the States. Individual joinder of all Class members is impracticable.

131.    The Class is ascertainable because its members can be readily

identified using registration records, sales records, production records, and other

information kept by Defendant or third parties in the usual course of business and

within their control. Plaintiffs anticipate providing appropriate notice to each

certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## II.    <u>Predominance of Common Issues</u>

132.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Class predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.    Whether the Class Vehicles suffer from the Inflator Defect;

b.    Whether Defendant knew or should have known about the Inflator Defect, and, if so, how long Defendant have known of the defect;

c.    Whether Defendant had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

d.    Whether Defendant omitted and failed to disclose material facts about the Class Vehicles;

e.    Whether Defendant's concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

f.     Whether Defendant's conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

g.     Whether Defendant misrepresented that the Class Vehicles were safe;

h.     Whether Defendant engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

i.     Whether Defendant's conduct, as alleged herein, was likely to mislead a reasonable consumer;

j.     Whether Defendant's statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

k.     Whether Defendant violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

l.     Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

m.     Whether Defendant's unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Class;

n.     Whether the Class Vehicles have suffered a diminution of value because of the Defective Airbags;

o.     Whether Defendant have been unjustly enriched by their conduct;

p.     Whether Plaintiffs and the Class are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

q.     Whether Plaintiffs and the Class are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

r.     Whether Defendant should be declared responsible for notifying all Class members of the Inflator Defect and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

s.     What aggregate amounts of statutory penalties are sufficient to punish and deter Defendant and to vindicate statutory and public policy;

t.     How such penalties should be most equitably distributed among Class members;

u.     Whether certain Defendant associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

## III.    <u>Typicality</u>

133.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendant. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

## IV.    <u>Adequate Representation</u>

134.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

135.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

## V.    <u>Superiority</u>

136.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendant have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

137.   This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendant's conduct and responsibility predominate over any questions affecting only individual Class members.

138.   Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

139.   The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of

class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

140.   Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, the Class or subclasses for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into sub-Classes.

141.   Plaintiffs and the Class expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims. Plaintiffs is informed and believes that injuries suffered in crashes as a result of Defective Airbags implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Defendant's delays and inaction regarding the commencement and completion of recalls, and because of the` installation of Defective Airbags as

replacement airbags. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Class.

## REALLEGATION AND INCORPORATION BY REFERENCE

142.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Class.

## CLAIMS FOR RELIEF

## COUNT 1

## Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.

143.   Plaintiffs bring this Count against Defendant on behalf of members of the Class.

144.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

145.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

146.   Each Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Each Plaintiff is a consumer because he

or she is a person entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

147.   Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

148.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

149.   Defendant provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendant warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

150.   Defendant breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect. Defendant have admitted that the Class Vehicles are defective in

issuing its recalls, but the recalls are woefully insufficient to address the Inflator Defect.

151.   Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

152.   Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendant, on the one hand, and Plaintiffs and the other Class members, on the other.

153.   Any limitations on the warranties are substantively unconscionable. Defendant knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendant failed to disclose the Inflator Defect to Plaintiffs and the other Class members. Thus, Defendant's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

154.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either Defendant or its agents (dealerships) to establish privity of contract.

155.   Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and their dealers, and specifically, of the implied warranties.

The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect.

156.   Plaintiffs provided written notice of breach to Defendants and a request to cure. Nonetheless, pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendant notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

157.   Furthermore, affording Defendant an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, Defendant knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

158.   Plaintiffs provided written notice of breach of implied warranties and related consumer protection laws, and opportunity to cure, by letters to Defendant.

159.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendant are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Vehicles by retaining them.

160.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

161.   Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Inflator Defect in his vehicle. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

162.   The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendant's conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Defendant, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## COUNT 2

## Fraud

163.   Plaintiffs bring this claim against Defendant on behalf of themselves and the members of the Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Defendant under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

164.   As described above, Defendant made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective Airbags contained therein.

165.   Defendant concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

166.   Defendant took steps to ensure that its employees did not reveal the known Inflator Defect to regulators or consumers.

167.   On information and belief, Defendant still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect.

168.   Defendant had a duty to disclose the Inflator Defect because it:

a.   Had exclusive and/or far superior knowledge and access to the facts, and Defendant knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.   Intentionally concealed the foregoing from Plaintiffs and Class Members; and

- 69 -

c.      Made incomplete representations about the safety and reliability of the Defective Airbags and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

169.   These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Defendant not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety, and to uphold its recall obligations under the Sale Agreement and governing laws.

170.   Defendant concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective Airbags and Class Vehicles were capable of performing safely, as represented by Defendant and reasonably expected by consumers.

171.   Defendant also misrepresented the safety and reliability of the Defective Airbags and Class Vehicles, because it either (a) knew but did not disclose the Inflator Defect; (b) knew that it did not know whether its safety and

reliability representations were true or false; or (c) should have known that its misrepresentations were false.

172.   Defendant actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Defendant money. It did so at the expense of Plaintiffs and the Class.

173.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

174.   Had they been aware of the Defective Airbags installed in the Class Vehicles, and Defendant's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles, or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Defendant's fraudulent concealment.

175.   Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Defendant's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Defendant's conduct.

176.    The value of all Class members' vehicles has diminished as a result of Defendant's fraudulent concealment of the Inflator Defect, and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

177.    Accordingly, Defendant is liable to Plaintiffs and the Class for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective Airbags and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

178.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Defendant. Defendant's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## **COUNT 3**

### **Negligence**

179.   Plaintiffs (excluding Alabama, California, Florida, Illinois, Massachusetts, Michigan, Nevada, North Carolina, Pennsylvania, and South Carolina Plaintiffs) bring this claim on behalf of themselves and the members of the Class under the common law of negligence, as there are no true conflicts case-dispositive differences) among various states' laws of negligence. In the alternative, Plaintiffs bring this claim against Defendant under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

180.   Defendant owed a duty of care to Plaintiffs and Class members, who were foreseeable end users, to design and manufacture its vehicles so that they would not be defective or unreasonably dangerous to foreseeable end users, including Plaintiffs and Class members.

181.   Defendant breached its duty of care by, among other things:

     a.     Negligently and recklessly equipping the Class Vehicles with Defective Airbags;

     b.     Negligently and recklessly failing to take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended;

      c.      Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

      d.      Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

      e.      Negligently and recklessly concealing the nature and scope of the Inflator Defect.

182.  Defendant's negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Plaintiffs and Class members, as well as ongoing foreseeable damages that Plaintiffs and Class members continue to suffer to this day.

183.  As a direct, actual, and proximate result of Defendant's misconduct, Plaintiffs and members of the proposed Class were harmed and suffered actual damages, which are continuing in nature, including:

      a.      the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

      b.      the continued exposure of Plaintiffs and Class members to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

184.   Defendant's negligence is ongoing and continuing, because Defendant continues to obfuscate, not fully cooperate with regulatory authorities, and manufacture replacement airbags that are defective and unreasonably dangerous, suffering from the same serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which poses an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

## COUNT 3

## Unjust Enrichment

185.   Plaintiffs bring this claim on behalf of themselves and the members of the Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring his claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

186.   Defendant has received and retained a benefit from the Plaintiffs and inequity has resulted.

187.   Defendant benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for his Vehicle, and/or would not have purchased his Vehicle at all; and who has been forced to pay other costs.

188.    It is inequitable for Defendant to retain these benefits.

189.    Plaintiffs do not have an adequate remedy at law.

190.    As a result of Defendant's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 4

### Violation of the Michigan Consumer Protection Act,

### Mich. Comp. Laws §§ 445.903 *et seq.*

191.    This claim is brought by Plaintiffs individually and on behalf of the Class against Defendant under Michigan law.  In the alternative, Plaintiffs bring this claim against Defendant under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

192.    Plaintiffs and the Class are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

193.    At all relevant times hereto, each Defendant was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

194.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).  Defendant engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the

Michigan CPA, including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendant participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

195.    In the course of their business, Defendant failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in

connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

196.   On information and belief, Defendant have known of the Inflator Defect in the Defective Airbags since the date that New Chrysler acquired substantially all of Old Chrysler's  books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendant failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

197.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendant engaged in unfair or deceptive business practices in violation of the Michigan CPA.  Defendant deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

198.   In the course of their business, Defendant willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed

above.  Defendant compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

199.   Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendant's brands, and the true value of the Class Vehicles.

200.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class.

201.   Defendant knew or should have known that their conduct violated the Michigan CPA.

202.   As alleged above, Defendant made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendant's representations, omissions, statements, and commentary  have included selling and marketing the

Class Vehicles as "safe" and "reliable", despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

203.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

204.  Defendant owed Plaintiffs and the Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendant:

a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.  Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

205.  Because Defendant fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of

negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

206.   Defendant's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

207.   Plaintiffs and the Class suffered ascertainable loss caused by Defendant's misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendant's complete disregard for safety, Plaintiffs and the Class either would not have paid as much as they did for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Class did not receive the benefit of their bargain as a result of Defendant's misconduct.

208.   Defendant's violations present a continuing risk to Plaintiffs and the Class, as well as to the general public.  Defendant's unlawful acts and practices

complained of herein affect the public interest.  The recalls and repairs instituted by Defendant have not been adequate.

209.   As a direct and proximate result of Defendant's violations of the Michigan CPA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage.

210.   Plaintiffs and the Class seek injunctive relief to enjoin Defendant from continuing their unfair and deceptive acts; monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and the Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

211.   Plaintiffs and the Class also seek punitive damages against Defendant because they carried out their despicable conduct with willful and conscious disregard of the rights and safety of others.  Defendant intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Plaintiffs and the Class on life-or-death matters, and concealed material facts that only they knew—all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them.  Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 5

### Breach of the Michigan Implied Warranty of Merchantability,

### Mich. Comp. Laws § 440.2314

212.   In the event the Court declines to certify a Nationwide Class under the Magnuson-Moss Warranty Act, Plaintiffs bring this claim on behalf of themselves and the members of the Class under the laws of Michigan against Defendant.  In the alternative, Plaintiffs bring this claim against Defendant under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

213.   Each Defendant is and was at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Mich. Comp. Laws § 440.2314(1).

214.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mich. Comp. Laws § 440.2314.

215.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts

of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

216.   Defendant was provided notice of these issues by letter from Plaintiffs, and from their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

217.   As a direct and proximate result of Defendant's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, requests the Court to enter judgment against Defendant, as follows:

A.   An order certifying the proposed Class, designating Plaintiffs as the named representatives of the Class, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

B.   A declaration that the airbags in Class Vehicles are defective;

C.      An order enjoining Defendant to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

D.      An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

E.      An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

F.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendant, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

G.      A declaration that Defendant must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

H.      An award of attorneys' fees and costs, as allowed by law;

I.      An award of prejudgment and post judgment interest, as provided by law;

J.      Leave to amend this Complaint to conform to the evidence produced at trial; and

K.      Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  March 14, 2018

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:*/s/ Rachel J. Geman*
Rachel J. Geman
rgeman@lchb.com
David Stellings
dstellings@lchb.com
250 Hudson Street, 8th Floor
NY, NY 10012
Telephone:  (212) 355-9500
Facsimile:  (212) 335-9592

Nimish R. Desai
ndesai@lchb.com
275 Battery St., 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Counsel for Plaintiff*